# Exhibit C

California Dept of Justice

4

# OPINIONS OF THE ATTORNEY GENERAL OF CALIFORNIA

*with* INDEX DIGEST

{ CITE THIS VOLUME
30 OPS. CAL. ATTY. GEN. }

VOLUME 30
*(July - December, 1957)*

EDITED BY
WARREN L. HANNA

*Published and Distributed
by*
HANNA LEGAL PUBLICATIONS
1029 POMONA AVENUUE, ALBANY 6, CALIFORNIA

LOS ANGELES COUNTY
LAW LIBRARY

KA236
A1C232

OPINIONS OF THE
ATTORNEY GENERAL
OF CALIFORNIA

COPYRIGHT 1958
HANNA LEGAL PUBLICATIONS

VOLUME 30
(July-December)

EDMUND G. BROWN

Printed at the
HOWELL-NORTH PRESS
Berkeley, California

Hanna Legal Pub. — 8/31/58

APR 1 1958

# EDMUND G. BROWN
ATTORNEY GENERAL

WILLIAM V. O'CONNOR, Chief Deputy Attorney General

F. G. DUTTON, Chief Assistant Attorney General
T. A. WESTPHAL, Chief Assistant Attorney General
San Francisco Office

## ASSISTANT ATTORNEYS GENERAL

| *Los Angeles* | *Sacramento* | *San Francisco* |
|---|---|---|
| Frank J. Mackin | Edward G. Benard | Emmet Daly |
| Gilbert F. Nelson (see Colorado River Board litigation, infra) | E. G. Funke | Henry A. Dietz |
| | Irving H. Perluss | Wallace Howland |
| | | Clarence Linn |
| | | James E. Sabine |
| Walter Rountree | | Herbert E. Wenig |

### COLORADO RIVER BOARD LITIGATION — LOS ANGELES

Gilbert F. Nelson . . . . . . . . . Assistant Attorney General

| | | |
|---|---|---|
| John Ritchie Alexander | Charles E. Corker | Jerome C. Muys |
| James R. Christiansen | Burton J. Gindler | Harry B. Sondheim |
| | James B. McKenney | |

wise noted.) The fund includes moneys from school district surpluses (sec. 7203) and will include balances in school district emergency aid funds (sec. 7202.1), the county's apportionable share of the United States flood control receipts fund (secs. 16415-16417, Gov. Code; sec. 7210 Ed. Code), and amounts allowed annually by the superintendent of public instruction (sec. 7001).

County superintendents of schools are authorized to expend the county school service fund only in the manner prescribed by the Legislature (secs. 7205, 7206, 7207). The Legislature has further provided that certain expenditures must be made with the approval of the county board of education (sec. 7210), others with approval of the superintendent of public instruction (sec. 7208), and still other apportionments may be made only with the approval of the county board of education and the superintendent of public instruction (sec. 7206).

Section 7209 provides:

> "Neither the county school service fund nor any property leased or purchased with moneys from said fund is subject to the jurisdiction or control of the board of supervisors. The title to all property purchased by the county superintendent of schools from said fund is in the office of the county superintendent of schools."

The foregoing cursory examination of the statutory scheme relative to county school service funds leaves no doubt that such funds are part of the financing of the State school system and are State moneys.

Grand juries have the duty of making careful examination of "the books, records and accounts of *all the officers of the county*, . . . and of every city board of education within the county . . ." and including "all the books, records and accounts of all officers of such county which are kept in their ex-officio capacity, as incumbents or officers of any special legislative district or other district created by or under the laws of the State of California, in their respective counties." (Pen. Code sec. 928.) (Italics added.)

Although the Legislature may provide that one county superintendent of schools may be elected for two or more counties (Cal. Const., Art. IX, sec. 3), we believe it to be reasonably free from doubt that county superintendents of schools are county officers (Gov. Code sec. 24000(k); Elections Code sec. 35; 27 Ops. Cal. Atty. Gen. 144, 147; see also *Coulter* v. *Pool*, 187 Cal. 181) (even though they are, more specifically, "school officers," i.e., "State officers" (Elections Code secs. 33, 34)). It follows that grand juries have not only the power but the duty to examine the books and records of their respective county superintendents of schools.

The only remaining question is whether a grand jury may examine a county superintendent's books and records with respect to a special fund held in trust for the State.

We believe it would be unreasonable and contrary to public policy to hold that a county officer might withhold certain books and records from a grand jury simply because he holds moneys in trust for the State or its agencies and is, in that sense, an agent of the State rather than the county.

We are not unmindful of the audit procedure required of county superintendents of schools by Education Code section 5010. However, this procedure does not, in our opinion, derogate from the power of county grand juries to investigate the official conduct of all county officers.

We therefore are of the view that a grand jury may examine the records of the county superintendent of schools pertaining to the county school services fund.

---

Opinion No. 57-126—September 24, 1957

**SUBJECT:** FURNITURE AND BEDDING — Inspection bureau for, may not arbitrarily establish "prevailing market price" for purposes of determining whether advertising is misleading, but may arrive at such figure, which is the predominating price that can be obtained in the same market for comparable merchandise at the time of sale, by investigation of such local market.

**Requested by:** SENATOR, 40th DISTRICT.

**Opinion by:** EDMUND G. BROWN, Attorney General.
Carl W. Wynkoop, Deputy.

Honorable Fred H. Kraft, Senator from San Diego County, has asked this office for an interpretation of the phrase "prevailing market price" as used in section 17501 of the Business and Professions Code, prohibiting the dissemination of untrue or misleading advertising as applied to the sale of furniture and bedding. The inquiry also asks whether the Bureau of Furniture and Bedding Inspection may determine a prevailing market price and enforce it.

Our conclusions may be summarized as follows:

The phrase "prevailing market price" contained in section 17501 of the Business and Professions Code means the predominating price that may be obtained for merchandise similar to the article in question on the open market and within the community where the article is sold. As such, the prevailing market price is determined *wholly* and *exclusively* by the conditions of the market at the time and place of sale. It therefore follows that the Bureau of Furniture and Bedding Inspection has no authority under section 17501 to fix or determine *ab initio* the "prevailing market price."

Though the Bureau may not arbitrarily *establish* a "prevailing market price" for furniture, they may *arrive* at such a figure based on their investigation of the local furniture market. The Bureau may then utilize this figure to guide merchants in their advertising or to discipline false advertisers.

ANALYSIS

(All section references are to the Business and Professions Code unless otherwise noted.)

Section 19210 provides that a violation of sections 17500-17502 of the same code may be a basis for the suspension of a license to engage in the sale of furniture and bedding. Section 17500, as applied to furniture and bedding, prohibits the making of untrue or misleading statements in advertising items of furniture and bedding for sale. With respect to this prohibition, section 17501 provides that "the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published." The purpose of sections 17500 and 17501 is to insure the truth and candor of advertisements which describe or characterize merchandise as possessing a certain worth or value. Its purpose is not to regulate actual sales price. A merchant may advertise or sell his goods, so far as this statute is concerned, for what he will, so long as he makes no untruthful or misleading representations as to value or former price.

The phrase "prevailing market price" in section 17501 has been upheld as not being void for uncertainty by the appellate division in the unreported case of *People* v. *Dorn* (1950, CR-A 2642 (L.A. Sup. Ct. App. Div.). The court saw no more uncertainty in this phrase than in the phrase "market price" as used as a measure of damages in civil suits under sections 1784 and 1787 of the Civil Code and sections 3317, 3353 and 3354 of the Civil Code. We therefore turn to the legion of civil cases which have defined such terms as "market price," "market value" and "market worth" for the definition of the phrase.

The case of *Continental Rubber Works* v. *Bernson,* 91 Cal. App. 636, 638, in considering a suit for the value of goods sold, accepted the following definition: "Bouvier in his Law Dictionary defines the term 'value' when referring to property as 'the price which it will command in the market' and 'market value' as 'a price established by public sales, or sales in the way of ordinary business, as merchandise,' and the 'price at which such articles are sold and purchased.'" This case has been approved by *Wade* v. *Rathbun,* 23 Cal. App. 2d 758, 760, and *Valentin* v. *Valentin,* 93 Cal. App. 2d 588, 592. This office in considering this question of the meaning of "market value" and "market price" has reached substantially the same definition (Cal. Ops. Atty. Gen. No. 5674).

Again, in *Lund* v. *Lachman,* 29 Cal. App. 31, 34, the court was presented with this phrase and defined it as follows: "Obviously, the market value of a commodity is the highest price in the market where it is offered for sale which those having means and inclination to buy are willing to pay for it; and it is equally obvious, we think, that market values are created and controlled by the condition of the market with reference to supply and demand rather than by the particular or peculiar selling ability of the seller." The same thought was expressed, though in different terms, by the court in *Conlin* v. *Southern Pacific R. R. Co.,* 40 Cal. App. 743, 745.

From these cases we can logically reason to the conclusion that the Bureau of Furniture and Bedding Inspection cannot set the market price. By definition, the market price must evolve of itself from market conditions of supply and

demand unaffected by any extrinsic influence. Therefore, the Bureau cannot set the market price or it ceases to be the market price and becomes the Bureau price. For sake of completeness the term "prevailing" in the phrase does not alter the concept essentially. "Prevailing" is defined by Webster's New International Dictionary Unabridged, 2d Ed. as "most frequent" or "predominant." Thus, it is not any price on the market that the statute refers to, for, of course, there is often more than one price for the same goods appearing simultaneously on the market, but the most common one. The statute applies to both the wholesale and retail market in the same way.

The application of these two statutes, section 17501 and section 17500, occurs in the so-called "comparative advertising" field, of which there are two basic variations. To better explain these, two types of hypothetical situations will be assumed. A furniture dealer advertises a mattress as "worth $100" but that he will sell it for $50. Hence, the adjective "comparative", for the dealer is comparing worth with selling price as an inducement to the purchaser. Unless the mattress is actually worth $100, which under section 17501 means that similar mattresses are selling for $100 in the open local market, the advertisement is false and deceptive and the dealer is guilty of a violation. The same furniture dealer runs another advertisement which offers a couch which he claims was formerly selling for $100 but is now selling for $50. Unless the price which he advertises as the former price actually coincides with the "prevailing market price" of the couch within the next preceding three months, or if before that, unless the dealer states the time that such former price actually did prevail, the advertisement is again false and deceptive, and the vendor is within the prohibitions of section 17500.

Contrasting the first type of advertisement with the second type, we see that though the first type makes a representation as to value or worth and the second type makes a representation as to former price, they both must coincide with the same standard, the "prevailing market price," which means the actual selling price of the article on the open market.

The position and duties of the Bureau of Furniture and Bedding Inspection in relation to these false advertising statutes which are incorporated into the Furniture and Bedding Act by section 19210, require a brief discussion. The Bureau, of course, is charged with the duty of enforcing the laws applicable to their licensees. As to these particular statutes the Bureau may ascertain the "prevailing market price" either from investigation of the market or consultation with experts in the field. This information can be used either as a guide to merchants who seek to advertise fairly or as evidence in a disciplinary action against an accused licensee. In the same manner, the Bureau can determine former selling price of merchandise by investigation of past markets with the same ends in view. The key fact which must be remembered is that the Bureau is not *fixing* or *establishing* the "prevailing market price" *ab initio* by these proceedings. They are merely examining the market as it exists by itself and making observations. They are not doing anything creative in the field of pricing by setting their own prices out. Therefore, the above mentioned practices are wholly within the powers and rights, indeed the duties, of the Bureau of Furniture and Bedding Inspection.